O'CONNOR, Respondent, v. WHITESITT, Appellant.

No. 8773.

Submitted January 31, 1948.   Decided April 7, 1948.

193 Pac. (2d) 365.

258

Mr. J. D. Taylor and Mr. D. A. Paddock, both of Hamilton, for appellant. Mr. Taylor argued the cause orally.

Mr. W. T. Boone and Mr. Jac W. Rimel, both of Missoula, for respondent. Mr. Boone argued the cause orally.

MR. JUSTICE CHOATE delivered the opinion of the court.

This action is one for the rescission of a written agreement for the purchase of a five acre tract of land near Stevensville, Montana, and the recovery of the sum paid upon its purchase price.

Plaintiff's complaint alleges that on July 11, 1946, the defendant, by an agreement in writing designated ''Earnest Money Receipt,'' agreed to convey to the plaintiff said tract of land for a total consideration of $5,800, payable $50 down, $2,500 July 16, 1946, and $3,250 August 16, 1946.

The execution of the agreement and the making of the first two payments totalling $2,550 are admitted. The complaint alleges that before the execution of said agreement plaintiff inspected the property and ''was conducted on a tour of examina-

tion of the property by defendant." At this time it is alleged that the defendant represented to the plaintiff, (a) that the well on the property was a "good and sufficient well, capable of supplying an ample quantity of water at all times for domestic use"; (b) that a quantity of lumber, siding and composition shingles then piled on the premises would be included in the sale should plaintiff agree to purchase the property; (c) that defendant would furnish an abstract of title.

This agreement to furnish an abstract was later complied with and no reliance on the asserted failure to furnish same is now claimed. The complaint further alleges that on or about July 20, 1946, plaintiff for the first time discovered a "concealed" ditch by which water from an irrigation ditch located near the property had been conveyed to the well on said property, and that at said time plaintiff also discovered a hole which had been made in the concrete lining of the well to permit discharge of irrigation water into said well; that at the time of the discovery of said "concealed" ditch its trough was still wet and damp but that a dam or closure had been placed across said ditch to prevent the flow of irrigation water through the same. It is alleged that the water which had been conveyed into said well through said ditch was harmful and totally unfit for domestic use. Also that said well goes dry for a considerable time each year and that defendant has often been required to haul water for domestic use. Plaintiff further alleges that when he took possession of the property the said lumber and building material which had been pointed out to him as going with the land had been removed by the defendant and returned to the lumber company from which they were originally purchased.

The complaint further alleges that the defendant was in a position of advantage with respect to knowledge of the facts and that he made the representations above set forth knowing of their falsity and with intent to deceive and defraud plaintiff; that plaintiff relied on said representations, believing them to be true and was thereby induced to enter into the agreement for the purchase of said land.

260

Defendant's answer admits that he informed plaintiff that the well on the premises "was a good well capable of supplying an ample quantity of water at all times for domestic use." As to the "concealed" ditch which plaintiff alleged had been used to carry water to the well on the premises, defendant admits that there was a small irrigation ditch located near the well on said land but denied that water carried in this ditch was discharged into the well. Defendant also denied that the hole in the concrete lining of the well had been made to permit irrigation water carried in said concealed ditch to enter the well. Defendant also denied the allegations as to the removal of the building materials from said premises.

Plaintiff's claim of right to have a rescission of his contract because of defendant's removal of about $75 worth of lumber and building materials from the premises for which plaintiff had contracted to pay $5,800 cannot be sustained. This breach of agreement by the defendant went to only a very small part of the consideration and could easily be compensated in damages. It cannot therefore constitute a ground for rescission of plaintiff's contract.

In Johnson v. Meiers, Mont., 164 Pac. (2d) 1012, 1014, we quoted with approval the following from 12 Am. Jur., "Contracts," section 440: " 'It is not every breach of a contract or failure exactly to perform—certainly not every partial failure to perform—that entitled the other party to rescind. A breach which goes to only a part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom. A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement. Before partial failure of performance of one party will give the other the right of rescission, the act failed to be performed must go to the root of the contract or the

failure to perform the contract must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for.' "

Eliminating the removal of the building material from consideration there remains the sole question whether rescission of said contract may be had because of defendant's alleged fraudulent representations concerning the *well* on said premises. These representations were as follows: That the well was a "good well," "100%," and "was capable of supplying an ample quantity of water at all times for domestic use."

To show the falsity of these representations plaintiff sought to establish the following facts: (1) That the well in question was not a "good well," that its water was contaminated and rendered unfit for domestic use by reason of the fact that there was a "concealed ditch" leading to a hole in the concrete wall of the well through which the defendant ran water from an irrigation ditch into the well and that defendant had constructed this concealed ditch in order to fill the well with water from the irrigation system; (2) that the well goes dry for a considerable time during each year and that plaintiff has often had to haul water for domestic use.

As we have indicated, the record discloses without contradiction that the defendant *did* make the above representations as to the quality and capacity of his well. We are of the opinion also that such representations were of matters peculiarly within the knowledge of the defendant and that plaintiff was entitled to rely on them.

The controlling question however is, *were these representations false?* Without attempting a summary of all the evidence presented in the 400 page transcript in regard to said alleged false representations, the following is its substance.

*The Well and the Concealed Ditch. Plaintiff's Case.* Plaintiff testified that on the 10th of July he and his wife and Mr. and Mrs. Whitesitt looked over the Whitesitt property and Mr. Whitesitt took them over to the well. At that time the well was fully covered on top with planks. Plaintiff discovered a hole

in the ground outside the well about a foot and a half deep and about that in diameter. He asked Whitesitt about it and the latter said: "Nothing can get in the well through that hole because there is a solid concrete wall in the well and the well is 100% in fine shape and everything."

On July 17th plaintiff took possession of the property. On July 19th he had a conversation with a neighbor in regard to the well in which he was told about "the well going dry" and also "learned that the ditch was there." The next day plaintiff inspected the property again and discovered a ditch "about six inches wide and about five or six inches deep which connected the well to an irrigation ditch which ran along the south side of the property and ran into that hole beside the well." The so-called "concealed ditch" was grown up to grass and could not have been seen if one did not know it was there. This ditch had been plugged on one end and on the end next to the well. Some rock had been thrown into the ditch and mud packed into it. Despite these obstructions, however, water (so plaintiff testified) had been running through the ditch and the bottom of the ditch was wet.

After making this discovery of the "concealed ditch" leading to the well, plaintiff again inspected the well, this time removing the planks on top of it. Plaintiff then "discovered that the water in the well was up pretty close to the top, down just a few feet." Plaintiff also noticed two boards extending into the well from the side of the concrete through a hole in the concrete. This hole extending through the concrete was "right below the hole on the outside of the well" which latter the witness estimated at about a foot and a half deep. After making this discovery plaintiff continued to occupy the premises until August 12th when he moved out after having first notified Whitesitt of his intention to rescind the purchase agreement.

On July 27th plaintiff testified that he had a conversation with Whitesitt at which time he showed him the "concealed ditch" and asked him what he knew about it and Whitesitt said, "some of the children must have dug the ditch." Plaintiff

testified that the "concealed ditch" was dug on top of the ground; that it was about six inches wide and was what we call an "open ditch." He also testified that during the entire time he was on the place he never saw any water come through any concealed ditch and run into the well. Asked whether water *could* get into the well from the outside through the hole in the concrete, plaintiff replied, "Yes, I imagine it could."

Plaintiff further testified that he "had never had much to do with irrigation ditches."

E. B. Daniels, plaintiff's witness, a photographer who took a number of photographs which were introduced in evidence, estimated the concealed ditch at 18 feet long and about six inches wide. On the occasion when he examined the well and the concealed ditch in order to take the photographs, he saw "some dampness in the bottom of the ditch."

Edgar Schroeder, plaintiff's witness, testified that in the winter of 1945-1946 he saw Whitesitt hauling water and was informed by him that "it [the well] would have to be dug deeper which he did." Asked whether the well had gone dry, witness said, "I can't say it was dry exactly but it was low." Referring to the concealed ditch and in reply to the question, "Did you examine the bottom of the ditch?" witness said, "The bottom was moist but it showed no indication of water running real recently. Due to being an irrigated country the bottom could be moist from sub-irrigation."

This witness also testified that it was along in February that he saw Whitesitt hauling water and that the latter was hauling *hot* water in ten-gallon milk cans.

Mrs. O'Connor. Her testimony need not be summarized as she substantially corroborated her husband's testimony. She added, however, the fact that on July 18th when she was hanging out her washing she tripped and fell over the concealed ditch, the width and depth of which she estimated at "about five or six inches." She also testified that the bottom of the ditch was damp but that she never saw water running in the

ditch nor did she ever see any water going into the well in the ground directly below the hole in the concrete wall of the well.

A. V. Baldwin, plaintiff's witness, a dairy farmer who had lived 11 years on the Whitesitt place and now lives on an adjoining ranch, testified that he dug the well involved in this action about 15 years ago. He said that a short time after the O'Connors moved in, O'Connor "wanted me to look at the well." They went to the well together. O'Connor showed him the little ditch that came down the south side "pointing right to the well." Witness said, "It was just a small ditch just carrying a little bit of water." It was about five or six inches deep and about eight inches at the top. The ditch, he said, "ends right at the well" and there was a hole right where the pipe came into the cement. Witness did not notice any hole in the ground but did see a hole in the concrete side of the well about "eight by eight." Witness admitted he "couldn't say whether the bottom of the ditch was damp or dry." He did, however, say that "judging from the looks of the grass and the ditch it showed that water had been in the ditch."

Upon the vital question as to *where* the water would go if allowed to flow in the "concealed ditch," this witness testified as follows:

"Q. If water is taken out of the Supply Ditch and placed into the ditch that flows westerly along the south edge of the property and then allowed to flow into the concealed ditch leading to the well, where would that water then go? A. I would judge that water would run to the cement and then to the bottom of the cement down the side. That is the way I would take it to be if it ran to well.

"Q. With the hole in the cement where would the water go? A. I think it would go to the bottom of the well.

"Q. Would it go into the well and to the bottom? A. I think it would go on the outside of the well.

"Q. Where was the hole in the concrete lining with respect to this ditch? A. It was a little to the northeast side of the well.

"Q. Was it below the level of the ditch? A. Oh yes, the hole was."

The question whether a well would be contaminated by running irrigation water into it need not be discussed since neither of the parties to the action deny that such contamination would result. It may be noted, however, the witness Baldwin testified that he had "seen dead cats, rats, dogs and everything pretty near you could think of." in the so-called supply ditch which was the main source of irrigation of the Whitesitt place and that he would not drink the water from the supply ditch. Witness estimated the carrying capacity of the concealed ditch at not more than an inch. He also testified that the water table rises in June and July and is at its height in July or August.

A. E. Clure, plaintiff's witness, was a dairy farmer who lives 80 rods north of the Whitesitt property and has known it for three years. Asked about the well going dry, said witness, referring to the winter of 1945-1946, said, "I don't know for sure about his [Whitesitt's] well going dry but pretty nearly every well in the county went dry. Ours went dry that year."

This witness also testified that sometime in the early spring of 1946, Ralph Whitesitt told him the well was dry and that he was hauling water and that witness "supposed he hauled water all through them dry months from February." As to the concealed ditch, this witness testified that when O'Connor showed it to him it was "pretty wet." Questioned as to where water would go if flowing in the concealed ditch, witness said: "It would have to go in the well—it couldn't go no place else."

This same witness, however, qualified the above testimony as follows:

"Q. Will you please tell the court where water would then flow in that ditch? A. It would either have to go down the side of the curb or else it would have to raise high enough to go in that hole in the well. It would be my opinion that a lot of that water would go down the outside of that well so that it would be perfectly filtered before it hit the well, that is, all the dirt and rile taken out of it."

*Defendant's Case.* The testimony adduced in behalf of the defendant may be summarized as follows:

Defendant Ralph Whitesitt testified that the so-called "concealed ditch" comes out of a ditch that runs east and west along his south line fence. Formerly the so-called "concealed ditch" was used to irrigate the back yard and the flowers where the defendant now has the new part of his house. When defendant built the new part of his house and dug the trench for its foundation and for the water pipes running out to the well, that operation stopped the ditch "somewhere within two or three feet from the well." Defendant thereupon put two dirt and rock dams into the ditch. He also put a dam into the part of the ditch nearest the well to start the water flowing west. In answer to the question whether at any time he used the so-called "concealed ditch" either to get a supply of well water or to augment the amount of water in the well, he answered, "Absolutely no."

He also testified that he never knew of the well going dry and that he used the water whenever he needed it. He assisted Mr. Fehrenkamp, the plumber, in putting in the electric pump in the fall of 1945. For that purpose defendant cut the hole in the cement lining of the well in order that the pipes from the electric pump might be put down into the well.

Mrs. Whitesitt, defendant's wife, testified that in the three years she had lived on the Whitesitt place the well had never failed to supply water for domestic purposes and had never gone dry. She corroborated her husband's testimony relative to the former use of the concealed ditch for irrigation purposes and its discontinuance after the new part of the house was built. She stated that no water was ever brought through the ditch and dumped into the well and corroborated her husband's testimony relative to hauling water from the creamery for washing purposes.

Carrie Dexter, defendant's witness, had known the Whitesitt home ever since they lived there. She said they always had water from the well whenever she was there and she never knew of any time when they did not have water from that well.

Oscar Enebo, defendant's witness, testified that he had known the Whitesitt place for at least 15 years; that several days after the deal between plaintiff and defendant was closed, O'Connor asked him to drive out to the Whitesitt place with him. When they got to the place, O'Connor pointed out the so-called ''concealed ditch'' leading toward the well and stated that water had been converted to the well. O'Connor also called witness' attention to a dirt and rock dam that was in the ditch a short distance from the well. Witness saw indications at that time that there had been water in the ditch flowing toward the well. The piece of ground between the well and the south line showed evidence of having had a good soaking. Witness however testified that the little dirt dam was in the ditch and was intact when he examined it. He also said there was no water in the hole on the outside of the well though it may have been moist.

Witness also testified that when O'Connor showed him the hole in the concrete he said, ''Now you see where they have made a hole for the water to enter.'' Witness told O'Connor that he didn't believe the hole had been made for water to enter the well, that ''I could see pipes going into the hole and that the logical thing was that they had made it for the pipes to go into the well.''

Witness Enebo also testified that he had been at the Whitesitt place at the time of the hearing to examine the concealed ditch. He found a dirt and rock dam at the place where the concealed ditch takes off from the larger ditch and a similar dam in that part of the concealed ditch which is closest to the well. Witness gave it as his opinion that if water were permitted to go into the so-called ''concealed ditch'' it would overflow its banks and run to the west because the general drainage there is west. He also testified that there is dirt around the well and that it is higher than the surrounding territory, especially on the east side of the well.

Fred Fehrenkamp, the plumber who installed the electric pump at the Whitesitt place in the fall of 1935, testified that he had to punch the hole in the concrete wall of the well in order

to get the pipes into the well; that later in February or March the pump sucked air and witness added 18 or 20 inches of pipe on the bottom. At that time he found better than three feet of water in the well. Witness estimated the depth of the well at 40 feet which he considered "adequate for a well in that vicinity."

Joe Lybarger, a farmer who had known the Whitesitt place around 20 years, testified with reference to the well, "All I have known it to be is a good well," and stated that he had never known of the well going dry. As to the concealed ditch he testified as follows: "That ditch is about the width of my shoe. It is probably about the depth of the thickness in through here. I will say that ditch is about eight or ten feet long, that leaves the other ditch and runs out toward the well but it don't hit the well by two or three feet. It turns off kind of to the south and that is the end of it."

Jesse B. Crowe had lived across the road from the Whitesitt place from October, 1944, to February, 1945. He never knew of the well going dry. This witness had often seen Mr. Whitesitt hauling water and on such occasions Whitesitt was getting hot water in his cans for his wife to do the washing.

J. V. Burnett testified that he owned the Whitesitt tract for nineteen and a half years. He testified that he always had sufficient water in the well for domestic purposes. He never knew of the well going dry and never had any trouble in getting sufficient water for domestic or other purposes. He testified that the water table would rise in the well to within five feet of the top, the average from the middle of June to the last of August being around ten feet.

Walter B. Crider had lived on the Whitesitt place from 1938 to the fall of 1945 and has been acquainted with the place since. He testified that he knew the well and the ditch in question. The ditch had been used to irrigate a small patch of ground before Whitesitt built a house over part of that ground, through which the ditch formerly ran. Witness never had a shortage of water from the well while he lived on the place.

Gilbert Heath lives right across the road from the Whitesitt place, never heard of the well going dry and "knows that the well had always put up enough water for the people living on the place at all times." He also testified that he knew of the Whitesitts hauling water from the creamery because "they could heat that water at the creamery in a few minutes."

Ernest Smith worked at the Bitterroot Creamery. He testified that Whitesitt hauled hot water from the creamery in 1945.

L. C. Battles was water supervisor in Stevensville. He took a sample of the water from the Whitesitt well in the forepart of September, 1946, and sent it to the state board of health for analysis, which showed the sample of water to be of satisfactory sanitary quality.

In reaching our conclusions in this case we are not unmindful of the rule invoked by appellant relative to non-interference with the findings of the trial court in equity cases when sustained by substantial evidence. However that rule is applicable only to cases in which there is some substantial evidence to support such findings.

In considering the evidence we are first confronted with what we regard as the inherent improbability of plaintiff's contention that defendant deliberately and intentionally contaminated his well in order to increase the amount of water in it. If it be conceded that water from defendant's irrigation system actually *was* conveyed into his well, it is undisputed that such water was totally and completely unfit for domestic use and would be injurious to the health of any person using it for domestic purposes. Plaintiff therefore in effect says: Mr. Whitesitt (according to plaintiff's exhibit No. 7D) was the owner of a modern farm dwelling house. He had remodelled this home, built on the east side of it and started the foundation for a new garage. He had installed an electric pump to pump water to his house out of the well involved in this action and he had put in a bathroom. The well was the only source of supplying water to his house for drinking purposes or other domestic use. Confronted with these facts we are asked to accept the theory

that defendant deliberately ran or attempted to run water into his well from an irrigation ditch, thereby contaminating the water and rendering it utterly unfit for domestic use; that for this purpose, namely, to augment the amount of water in the well, defendant cut a hole in the concrete wall of his well and ran irrigation water through this hole by means of the "concealed ditch" into the well. In our opinion, if there *is* any testimony in the record to the effect that defendant did so strange and improbable an act, it should be scrutinized with the utmost care in view of its inherent improbability. We can scarcely conceive of anyone so contaminating his sole supply of water for domestic use, especially when, so far as the record discloses, there was no need to augment the supply of water in the well. However, aside from the question of probability as to what a reasonable person *would* have done, we find no evidence that water from the concealed ditch ever actually *did* flow into the well. There is some evidence that water had been in the "concealed ditch" arising from the fact that the bottom of the ditch was found to be moist. There is also speculation and expression of differing opinions as to whether water, if permitted to go into the "concealed ditch," *would* flow through the hole in the concrete wall of the well or whether it would run down the outside of the well or run in a westerly direction away from the well, following the natural slope of the land.

Neither plaintiff nor anyone else, however, ever saw any water running through the "concealed ditch" and into the well. Plaintiff relies upon the testimony of the witnesses Schroeder, Baldwin and Clure, whose testimony we have reviewed. Their evidence goes no further than to establish the fact that when they examined the ditch they found it "damp" or "moist," thereby indicating that some water had been in the ditch at some time. None of these witnesses, however, so far as the record discloses, ever took the six paces which would have sufficed to explore the entire length of the 18-foot "concealed ditch" to find out just where the water went and none of them ever saw any water

running into the well from the concealed ditch or from any other source.

On the issue of why the hole was cut in the concrete wall of the well, we think the evidence preponderates strongly in favor of the defendant. It seems far more reasonable to believe that this hole was cut, as testified by both defendant and the plumber who did the work, for the purpose of running pipes into the well when the electric pump was installed, rather than to accept plaintiff's theory unsupported by any testimony that the defendant cut the hole in order to run irrigation water into his well.

Throughout the trial of the case much has been said about the so-called "concealed ditch." We find no evidence in the record that defendant did anything to "conceal" this tiny open ditch or lateral which ran on the top of the ground, carried not over an inch of water and could be closed up completely by a few shovelsful of dirt. If this ditch was concealed it was by reason of grass and other vegetation which naturally "conceals" small ditches of this sort in most irrigated areas.

The word "conceal," "implies affirmative action, something more than a mere failure to disclose." 15 C. J. S., page 793. In view of the conclusions we have reached on the merits of this case, there was no occasion for the defendant to make known to the plaintiff the existence of this small lateral or ditch in which dams had already been placed and which was only one of numerous ditches running across the place.

Upon the issue of defendant's well going dry "for a considerable period of time during each year," and the defendant being "often required to haul water for domestic use," there is almost a complete failure of proof of plaintiff's allegations and there is ample contrary evidence. It is true that the witness Edgar Schroeder did testify that in the winter of 1945-1946 he "saw Mr. Whitesitt hauling water." However, it developed from other witnesses that defendant was hauling *hot* water from the creamery. This witness also testified that he was informed by Mr. Whitesitt that the well would have to be dug deeper.

Asked whether the well had gone dry he answered, "I couldn't say it was dry exactly but it was low." Plaintiff's witness A. E. Clure testified that in the winter of 1945-1946, "pretty near every well in the country went dry" and that Whitesitt told him there was no water in his well. In addition to his own and his wife's testimony, defendant produced six witnesses whose evidence we have reviewed, who had been familiar with this well and for varying lengths of time and who testified that it had always been considered a good well and it had always produced ample water.

We are of the opinion that there is no substantial evidence to support the findings of the honorable trial judge in so far as the same relate to the making of false representations by defendant to the plaintiff concerning the well on the premises involved in this action.

The judgment of the lower court is reversed with costs to be borne by the respondent, and with directions to dismiss the action.

Nothing in this decree contained shall, however, be deemed to bar the right of plaintiff to recover from the defendant in an appropriate action the reasonable value of the lumber and building material referred to in paragraph 4-B of plaintiff's complaint, which defendant agreed with plaintiff should be included in the sale of the land.

Mr. Chief Justice Adair and Associate Justices Gibson, Angstman and Metcalf concur.

On Motion for Rehearing.

MR. JUSTICE CHOATE delivered the opinion of the court.

Plaintiff's petition for a rehearing asserts that this court erred in stating in our opinion that "We find no evidence that water from the concealed ditch ever actually did flow into the well," and that other evidence tending to establish the falsity of the representations made by defendant were overlooked.

Petitioner first directs attention to the testimony of the witness Daniels. That witness did *not* testify that he ever saw any

water in the concealed ditch or flowing through it into the well. The fact that the witness said he saw a hole in the ground which "had every bit of the appearance of having been made by water running through it and down into the ground" and that the concealed ditch *could* carry sufficient water to make such a hole, is a far cry from saying that he saw water flowing in the ditch. Whether the dampness in the bottom of the concealed ditch came from subirrigation, whether the ditch had been used to irrigate the land lying to the west, or whether if water would get into the hole at the outside of the well it could have gone into the inside of the well instead of going down the concrete lining to the bottom of the well, all were matters of conjecture.

Petitioner further says that the defendant himself admitted on cross-examination that the hole in the ground at the side of the well "was made by irrigation water from the concealed ditch." To the question, "Do you want the court to understand that the hole at the side of the well which you observed when you came back was made by water coming from the concealed ditch?" witness replied, "I presume so, from the high water running over this concealed ditch and coming down here to this cement, naturally it stands there and backs up." Waiving the fact that the statement, "I presume so," has slight evidentiary value, the language quoted above should be read in the light of appellant's total testimony on that point.

Baldwin's testimony was reviewed at considerable length and need not be repeated. Our opinion quoted his testimony that the "little ditch pointed right to the well" and "ends right at the well." This witness however "could not say whether the bottom of the ditch was damp or dry" but said that the ditch showed water had been in it recently. Baldwin's further testimony as quoted in our opinion was that in his judgment if water were permitted to flow in the concealed ditch it would "run to the cement and go to the bottom of the well on the *outside* of the well." It is true our opinion did not quote Whitesitt's testimony to the effect that in the year 1946 before he left the property he made use of the concealed ditch "two or three

times,'' the last time being ''around the 4th of July.'' His testimony was that in the spring of 1946 he used the concealed ditch two or three times ''to the extent of running a little trickle of water not over an inch for three or four hours to let it soak west on the yard under the clothesline.'' There was of course nothing in this testimony to indicate that Whitesitt constructed the concealed ditch in order to fill the well with water from the irrigation system, nor did it tend to prove that on those brief occasions of using the concealed ditch for irrigation, water flowed or was conducted through the concealed ditch into defendant's well. Hence our failure to quote it in the opinion.

We see no occasion for again reviewing the testimony of the witness Clure. Our opinion points out that he qualified his testimony that water flowing in the concealed ditch ''would have to go in the well. It couldn't go no place else,'' by stating that in his opinion, ''a lot of the water would go down the outside of the well.''

The petition for rehearing also complains that we did not quote all the testimony of the witness Schroeder relative to water reaching the well. This witness *did* testify that in midwinter of 1945-1946, Whitesitt was watering three head of stock out of a water trough which was supplied with water from his well. This watering trough or tank was located in the immediate vicinity of a ditch, *not* the concealed ditch, but one which ran nearly north and south a little distance from the concealed ditch and which conveyed water out of the west ditch over to the area where the watering trough was located. Witness testified that on one occasion when he was crossing the Whitesitt property he observed that water coming down this ditch had ''made a large puddle around that stock tank'' and ''from there was a small ditch [not the concealed ditch] which went directly to the well'' and through it water went into the well. It is to be noted that the ditch through which water was conducted from the ''puddle'' to defendant's well was *not* the concealed ditch at all but was, according to the testimony, another ditch which ran almost parallel to the concealed ditch.

However, and whether it came through the concealed ditch or any other ditch, no reasonable minded person could construe the above evidence to support the theory that because a large puddle of water caused by watering stock in mid-winter had formed near defendant's water tank and from thence had run into another ditch which led to defendant's well, tends to support plaintiff's contention that defendant constructed the concealed ditch in order to fill the well with water from the irrigation system.

In our opinion the petition for rehearing has no substantial merit and none of the omissions which petitioner asserts were made by this court in reviewing the testimony warrants any different disposal of the case on the merits.

The petition for rehearing is denied.

Mr. Chief Justice Adair and Associate Justices Gibson, Angstman and Metcalf concur.

Rehearing denied May 10, 1948.